UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                         :

Javier Card,                               :    No. 17-cv-00221
                                           :

                       Petitioner,     :    **PETITION FOR WRIT OF HABEAS**
                                         :    **CORPUS ON BEHALF OF AN**
                    vs.             :    **INDIVIDUAL IN STATE CUSTODY**
                                         :

Thomas Griffin, Superintendent Green Haven    :
Correctional Facility                              :
                        Respondent.   :
                                         :
---------------------------------------------------------------X


To the Honorable Judge of the United States District Court for the Eastern District of New York:

## PROCEDURAL HISTORY

1.      Petitioner Javier Card, was convicted Supreme Court of the State of New York, Kings County.

2.      The date of the judgment of conviction is September 6, 1995.

3.      Mr. Card was sentenced to a term of imprisonment of twenty-five years to life, to run concurrently with a term of five to fifteen years, and consecutively with a term of one-and-two-thirds to five years, respectively.

4.      Mr. Card is currently incarcerated  pursuant to the judgment appealed.  No stay has been sought.

5.      Mr. Card was convicted of one count of murder in the second degree, N.Y. Penal Law § 125.25, one count of criminal possession of a weapon in the second degree, *id.* § 265.03, and one count of reckless endangerment in the first degree, *id.* § 120.25.   He was sentenced to a term of imprisonment of twenty-five years to life, to run concurrently with a term of five to

fifteen years, and consecutively with a term of one-and-two-thirds to five years, respectively (Mastro, J., at trial and sentence).

6.      Mr. Card pled not guilty to the offenses charged and a trial on the issue of guilt or innocence was held before a jury.

7.      Mr. Card did not testify on his own behalf.

8.      The facts of Mr. Card's appeal and collateral proceedings are as follows:

a.      Mr. Card appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department arguing, *inter alia*, that he was deprived of his Sixth Amendment right to the effective assistance of counsel.

b.      The Appellate Division dismissed Sixth Amendment challenge as *dehors* the record and affirmed Mr. Card's conviction.

c.      The date of the Appellate Division's decision was June 12, 2013.  *See People v. Card*, 107 A.D.3d 820, 968 N.Y.S.2d 803 (App. Div. 2013).  A copy of the decision is attached as Exhibit A.

d.      Mr. Card sought leave to appeal to the Court of Appeals on that issue. on September 18, 2013,  Judge Robert S. Smith of the Court of Appeals denied leave.  *See People v. Card*, 21 N.Y.3d 1072 (2013).  A copy of the certificate denying leave is attached as Exhibit B.

9.      Mr. Card also sought to vacate the judgment pursuant to  N.Y. CPL § 440:

a.      Mr. Card moved to vacate the judgment pursuant to N.Y. CPL §§ 440.10, 440.20, before the Supreme Court on May 14, 2009 (Tomei, J.) ("the 2009 Motions") arguing that he was deprived of his Sixth Amendment Right to effective assistance of counsel.

     i.  The Supreme Court held an evidentiary hearing on September 20, and September 27, 2010.  Excerpts of the hearing transcript are attached as Exhibit C.

     ii.  The Supreme Court denied the 2009 Motions on November 3, 2012.  A copy of that decision is attached  as Exhibit D.

     iii.  Leave to appeal the denial of the 2009 Motions was denied by Sheri S. Roman of the Second Department on January 13, 2011.  A copy of that order is attached as Exhibit E.

     iv.  Judge Roman denied leave to reargue the denial of leave to appeal on February 10, 2012. A copy of the order is attached as Exhibit F.

b.  Mr. Card also moved to vacate the judgment pursuant to N.Y. CPL § 440.10, before the Supreme Court on November 14, 2012 (Simpson, J.) ("the 2012 Motion") asserting that he was deprived of his Sixth Amendment Right to effective assistance of counsel.

     i.  The Supreme Court denied the 2012 Motion without a hearing on October 23, 2014.  A copy of that decision is attached as Exhibit G.

     ii.  Leave to appeal the denial of the 2012 Motions was denied by Sheri S. Roman of the Second Department on January 14, 2016.  A copy of that order is attached as Exhibit H.

## BACKGROUND

On May 2, 1988, Elsa Nelson died of a gunshot wound inflicted outside Michelle's Cocktail Lounge in the Flatbush section of Brooklyn, New York following a dispute.  On May 12, 1991, Mr. Card was arrested in Philadelphia on a warrant relating to Ms. Nelson's death.  Mr. Card was charged under Indictment Number 5797/91 with one count of second-degree murder, one count of first degree reckless endangerment, one count of second degree criminal possession of a weapon, and one count of third-degree criminal possession of a weapon on June 11, 1991. He was arraigned on January 12, 1995.

### Pre-Trial Proceedings

On or around January 12, 1995, the Court appointed Samuel Gregory to represent Mr. Card.  *See* Exhibit I, Affirmation of Javier Card, dated March 30, 2009 at ¶ 3.  At that time, Mr. Gregory knew that the case involved a 1991 indictment relating to a shooting that took place in 1988.  Exhibit J, January 19, 1995 Hearing Transcript 4:24-26.

#### Arraignment and Introductory Meeting

Mr. Card was arraigned on January 12, 1995 and briefly spoke with Mr. Gregory at his arraignment.  As with the majority of the discussions that took place when Mr. Card attended pretrial proceeding, his conversation with Mr. Gregory was brief—7 to 12 minutes—and focused primarily on Mr. Gregory explaining the nature of the proceeding to Mr. Card.

Close to the time of Mr. Card's arraignment, Mr. Gregory met with Mr. Card where he was detained in Brooklyn.  Exhibit I at ¶ 6.  There was no in-depth discussion of the facts, potential witnesses, or trial strategies.  *Id.*  During their first meeting, Mr. Gregory stated that he was overloaded with his current caseload and that he needed to clear some cases before he could

concentrate on Mr. Card's case. *Id.* at ¶ 6. Mr. Gregory also told Mr. Card that in a worst case scenario, he could obtain a continuance. Exhibit I at ¶ 6.

### Pretrial Proceedings January – June, 1995

Mr. Card's case was calendared for pretrial proceedings six times between February and June, 1995. Mr. Card recollected having gone to court on 1 to 2 of these dates and Mr. Gregory had no independent recollection of these proceedings. *See* Exhibit C, 70:19-22; 157:5-9. These meetings with Mr. Gregory in the court room and occasionally in the cell where Mr. Card was held, were brief and, as with the discussions at Mr. Card's arraignment, centered on explaining what would occur in the courtroom to Mr. Card. *Id.*, 71:6-9. Mr. Gregory had no independent recollection of these discussions, but stated that he assumed the discussions were "about the case." *Id.*, 158:21-25.

Mr. Card repeatedly called Mr. Gregory during the roughly six months between their initial January meeting and the pre-trial proceedings in July, but only managed to speak with him twice by phone. Exhibit I, ¶ 8. Mr. Gregory never returned Mr. Card's phone calls or visited him in jail. *Id.* The two times that Mr. Card managed to speak with Mr. Gregory on the telephone, neither the facts of the case, potential witnesses, nor trial strategies were discussed. *Id.* Mr. Gregory merely told Mr. Card that he was busy with other cases and would get to Mr. Card's case when he had dealt with the other cases but that there was no need for concern as the case could simply be continued if necessary. *Id.*

In April 1995, Mr. Gregory filed an omnibus motion which included a request for discovery and a bill of particulars. Exhibit C, 193:15-21. Mr. Gregory would later explain that he would have preferred to "do [his] own homework" rather "than rely on the Prosecution to give

[him] information," but that he would do so periodically during his time on the 18B panel.  *Id.*, 193:22-25.

On June 14, 1995, former Kings County Assistant District Attorney Maria Bukumira-Bloom requested a continuance to which the defense consented.  Due to the time since the 1988 events, Ms. Bukumira-Bloom explained that the prosecution's "witnesses [were] spread around the country."  Exhibit K, Transcript of June 14, 1995 Hearing 2:18.  That same day, Mr. Card provided Mr. Gregory with a list of people he was with May 2, 1988, and asked Mr. Gregory to try and locate them.  Exhibit I at ¶ 11; *see also* Exhibit C, 14:23-24.  Despite knowing of the difficulties that the prosecution was grappling with and having a list of potential witnesses, Mr. Gregory did not begin attempting to locate potential witnesses or seek appointment of an investigator.

### Plea Negotiations

On or about June and July of 1995, Mr. Gregory attempted to negotiate a plea agreement with Ms. Bukumira-Bloom under which Mr. Card would plead guilty to manslaughter in the first degree.  *See* Exhibit L, Declaration of Samuel Gregory, dated June 26, 2012 ¶ 4.  In a pretrial hearing on June 14, 1995, Ms. Bukumira-Bloom informed the Court that "[t]here's a possibility of a disposition."  Exhibit J, 3:4.  Mr. Card expressed to Mr. Gregory his interest in a plea deal that would allow him to serve any sentence concurrently with the sentence that he was serving in Washington, D.C.  Exhibit L, ¶¶ 4-6.  Mr. Gregory informed Mr. Card that Ms. Bukumira-Bloom would only offer a plea agreement where Mr. Card's sentences would run consecutively; concurrent sentences were not made available to Mr. Card.  Exhibit L, ¶ 7.

At the time, Mr. Card mistakenly believed that the offer of a plea with consecutive sentences offered no significant advantage to the sentencing risk he faced at trial.  Exhibit L, ¶ 7.

The only conversation that Mr. Card recalls having with Mr. Gregory regarding the plea occurred in court where, when asked how much time the plea would carry, Mr. Gregory responded that "he really did not know how much time the plea would carry" but "if he would have to make a guesstimate, he said it would be ten to twelve years before [Mr. Card] saw [the] Parole Board." Exhibit C, 74:19-22.  At the time, Mr. Gregory believed that Mr. Card would seek an acquittal at trial unless Mr. Card was offered a plea to a sentence that would run concurrently.  Mr. Gregory acknowledges, "it is unlikely that I would have informed Mr. Card that, had he [taken] the offer, he would have been eligible for conditional release after serving 16 years even if he had been unsuccessful before a parole board."  Exhibit L, ¶ 9.  Critically, Mr. Gregory also acknowledges that he "did not offer any opinion on whether Mr. Card should [have] accept[ed] the plea offer." Exhibit L, ¶ 10.  If Mr. Card had been fully apprised of his sentencing options, and if Mr. Gregory had explained the differences in sentences which would have resulted from accepting a plea versus standing trial, Mr. Card would have accepted the plea offer of first-degree manslaughter.

### Trial Counsel's Requests for a Continuance are Denied and Trial Begins

On July 11, 1995, the Honorable Justice Firetog asked Mr. Gregory whether the defense was ready to proceed to trial Mr. Gregory stated unequivocally "I'm not ready."  Exhibit M, July 11, 1995 Hearing Transcript 2:17, to which Justice Firetog replied "I know.  You will be ready tomorrow though."  Exhibit M, 2:18-19.  Mr. Gregory continued "Judge, I have to do – complete an investigation.  *I've been tied up.*"  Exhibit M, 2:20-26 (emphasis added).

Mr. Card asked Justice Firetog to reconsider, citing Mr. Gregory's inattention to his case:

> With all due respect, your Honor, because it is my life; you know what I mean. It's a murder case. It's not a little misdemeanor. I know for a fact we ain't ready because we haven't really had a chance to really do nothing. I've been in six months."

Exhibit M, 3:19-22. Unmoved, Justice Firetog responded, "[y]ou're going to have to work on it because you're going to trial." Exhibit M, 3:23-24.

On July 17, 1995, immediately prior to jury selection, Mr. Gregory reiterated the need for more time before the Honorable William Mastro, stating that:

> I had a discussion this morning with Mr. Card, and it's our position, Judge, that we are not ready for trial.

> There are a number of witnesses who were present in the location where this alleged shooting took place, potential defense witnesses that Mr. Card was able to get some leads on very recently.

> He informed me this morning if we have a little time we can find these witnesses, and for that reason both Mr. Card and myself request an adjournment on this case.

Exhibit N, July 17, 1995 Hearing Transcript 2:6-16.[1]

Justice Mastro responded that the defense had "answered ready for trial last week when the case was sent to me." Exhibit N, 2:18-19. He denied the adjournment request because he felt there was "a sufficient amount of time to contact any witnesses that the defense deems necessary to call." Exhibit N, 3:4-8. Mr. Gregory then clarified that he never answered ready for trial before Justice Firetog, who had nevertheless denied the adjournment and set the case down for trial. Ex. N, 3:9-14.

---

[1] The transcript is incorrectly dated July 17, 1991.

For his part, Mr. Card told the Court,

> I've been back here in New York City since January.  Me and Mr. Samuel [sic], I ain't seen him not one time rather than one week in court, and I've gone through this procedure. . . . I don't know about nothing.  I just came here last week and he says trial.  We ain't even sat down.
>
> I understand the Court has procedures to go, but it's almost my life, you know, and I don't feel I'm prepared to defend my life. . . .  So I got to, you know, really get ready.  I am not saying he is not an efficient lawyer, just that he been busy, never had a chance to even sit down . . . .

Exhibit N, 3:23-4:11.

Mr. Gregory corroborated this account, telling the Court that:

> "I just haven't had enough time to get ready … [T]he reason really now is acutely obvious[], as Mr. Card told you.  At this particular time I haven't spent enough time with the case with Mr. Card, and general investigation problems that I was [sic] encountered."

Exhibit N, 5:2-7.

Justice Mastro asked if Mr. Gregory was unaware of Mr. Card's request to locate additional witnesses until a few days earlier, and Mr. Gregory responded that "it's my understanding [that] Mr. Card was able to get a *lead* on witnesses in the last week that he otherwise was not able to locate."  Exhibit N, 5:2-7. 5:17-19 (emphasis added).  Mr. Gregory later explained that he had no independent recollection of when exactly he received the names of the witnesses from Mr. Card.  Exhibit C, 164:22-25.  Further, Mr. Gregory acknowledged that in discussing the issue with Justice Mastro on July 17th he was attempting obtain more time to investigate the case.  Exhibit C, 16:7-10.  Justice Mastro denied the request, noting that the case had been pending for months.  Exhibit N, 5:24-6:9.

Mr. Gregory was left with five days to investigate a case the prosecution had been wrestling with for months.  His assumption that he could obtain continuances as needed seriously damaged the defense's ability to prepare.

**<u>Mr. Card's Discussions with Trial Counsel Regarding his Case</u>**

Mr. Card's only substantive discussions regarding trial strategy occurred on July 11 and July 17, 1995. Exhibit I, ¶¶ 9-11. Mr. Card told Mr. Gregory his version of the events of May 2, 1988 and included details of the mutually violent nature of his prior relationship with the deceased, Elsa Nelson. Exhibit I, ¶¶ 10, 35. Mr. Card requested that Mr. Gregory track down hospital records evidencing a prior incident where Elsa Nelson had slashed Mr. Card in the face. Exhibit I, ¶¶ 10-11. Mr. Gregory never discussed the hospital records with Mr. Card again.

Notwithstanding Mr. Gregory's concession on the record that he "ha[dn't] spent enough time with the case with Mr. Card," Exhibit N, 5:2-7, the conversations on July 11, and July 17, 1995 remained brief, lasting roughly only 15 to 20 minutes during and after the pre-trial proceedings. *Id.* at ¶ 10-11. Mr. Card repeatedly tried to reach Mr. Gregory during the week leading up to trial but Mr. Gregory never spoke with him during this period. Exhibit I, ¶ 21.

**<u>Trial Counsel's Eleventh-Hour Investigation</u>**

On July 18, 1995, Mr. Gregory obtained copies of the police reports and the statements of the witnesses the prosecution intended to call. Exhibit C, 164:10-14. That same day, nearly six months after his appointment and only six days before the prosecution was scheduled to present its case, Mr. Gregory belatedly moved the Court for a private investigator. Exhibit O, Affirmation of Samuel Gregory, dated July 18, 1995. In requesting a court-ordered investigator, Mr. Gregory asserted that "[u]pon consideration of all the facts available to me, I have determined that the services of an investigator will be necessary to enable me to effectively represent my client." *Id.*

The court appointed investigator, Michael Race, began his investigation into the case at the time of jury selection. Exhibit P, Affirmation of Michael Race, dated September 4, 2007, ¶

2.  Usually Mr. Race was retained months in advance for an investigation in cases involving comparable charges.  *Id.*  Before this time, Mr. Gregory never discussed seeking or obtaining an investigator with Mr. Card.  Exhibit I, ¶ 19.  Mr. Gregory never set up a meeting between Mr. Card and Mr. Race, and as a result Mr. Card and Mr. Race never met before or during the trial. Exhibit P, ¶¶ 2-5.

Mr. Gregory never discussed the defense of Extreme Emotional Disturbance ("EED") during any of their pretrial discussions.  Mr. Card was never interviewed by a psychiatrist as to his emotional state at the time of the shootings, nor did Mr. Gregory ever inform Mr. Card of the retention of any psychiatrist or psychologist in aid of the defense.  Exhibit I, ¶¶ 14-15.

**The Trial**

Mr. Card's trial began on July 24, 1995 and concluded with a guilty verdict on July 27, 1995.  When the trial began, Mr. Gregory whose own abbreviated investigation had not located any witnesses, had two sources of information regarding the night of May 2, 1988: (1) his brief discussions with Mr. Card on July 11th and July 17th, and (2) the discovery he obtained from the prosecution on July 18th.

Mr. Card had already explained to Mr. Gregory that the shooting took place outside of a crowded bar, following a dispute with Elsa Nelson inside the bar, and that Mr. Card had a violent relationship with Elsa Nelson which had resulted in Mr. Card's prior hospitalization.  Exhibit I, ¶¶ 10-11. Yet, at no point prior to trial did Mr. Gregory consider an EED defense or any other affirmative defense.  Exhibit I, ¶¶ 14-15.

**The People's Case**

The People called twelve witnesses who testified for roughly 170 transcript pages of direct testimony.   Mr. Gregory called two witnesses who gave roughly six pages of direct

testimony.  All of the prosecution witnesses were at Michelle's Cocktail Lounge (the bar where the shooting took place) on May 2, 1988, and testified to the events culminating in the shooting of Elsa Nelson.

### Elsa Nelson Travels to Michelle's Cocktail Lounge Around Midnight on May 2, 1988, and Leaves After Seeing Mr. Card with his new Girlfriend

Near midnight on May 2, 1988, Elsa Nelson, a former girlfriend of Mr. Card's, went to Michelle's Cocktail Lounge, a bar in the Flatbush section of Brooklyn located on the corner of Bedford Avenue and Albemarle Road, with her two sisters, Julia Nelson and Marcia Nelson, and a few friends.  Exhibit Q, Excerpted Trial Transcript July 24 – July 27, 1995, 305:7-23.

When Elsa Nelson's group walked into the bar, they saw Mr. Card seated at a table with his new girlfriend, Pam Davis, and a few friends.  Exhibit Q, 306:12-16.  After staying for a short while, Elsa Nelson's group left the bar shortly after seeing Mr. Card and his friends.  Julia Nelson, Elsa Nelson and her friends then went to a bar approximately fifteen blocks away. Exhibit Q, 309:11-12.

### Elsa Nelson and Friends Return to Michelle's Cocktail Lounge Between Two to Three Hours Later

Elsa Nelson and Julia Nelson and their friends returned to Michelle's Cocktail Lounge approximately two to three hours later.  Mr. Card and his friends were still there.  Elsa Nelson and her friends then began taunting Pam Davis, Mr. Card's new girlfriend.  Exhibit Q, 317:12-21.  Mr. Card got up to dance with Ms. Davis while Elsa Nelson and her friends continued to taunt her.  Exhibit Q, 318:10-12.  As the taunting continued Mr. Card subsequently pulled a gun from his waistband in front of 40 to 50 witnesses.  *Id.*, 257:8-10; 319:2-10.  In response, Elsa Nelson shoved Ms. Card and attempted to break a bottle a bottle in half on the side of the bar. *Id.*, 140:10-20, 423:14-17.  The manager of Michelle's Cocktail Lounge, Edward McDonald,

then intervened and asked Mr. Card to put away the gun. *Id.*, 259:19-21. Mr. Card agreed and began to walk away. *Id.*, 259:19-24.

Elsa and Julia Nelson screamed at Mr. Card while Mr. McDonald was trying to calm him down and Mr. McDonald asked them to leave. *Id.*, 260:15-23; 468:13-15; 472:23-473:3. Instead, Elsa Nelson and Julia Nelson began to throw bottles at Mr. Card while Mr. McDonald was attempting to walk him out the door. *Id.*, 322:4-20; 426:24-427:2 (testifying that Elsa Nelson threw a bottle). As Mr. McDonald walked Mr. Card away, someone threw a bottle towards them from the back of Michelle's Cocktail Lounge. Mr. Card wheeled and raised the gun. Mr. McDonald continued to talk to Mr. Card and Mr. Card lowered the gun again. (*Id.*, 261:3-10, 262:16-18. Right as Mr. Card had lowered the gun and started moving back towards the door, a second bottle struck Mr. Card in the head at which point Mr. Card turned and fired off a shot towards the back of the bar where Julia and Elsa Nelson were standing. *Id.*, 263:4-5; 469:7-15. The shot struck Julia Nelson in her right leg. *Id.*, 356:4-13.

After Mr. Card fired, Julia Nelson left the building through the side door, and she and others pushed Elsa Nelson out the side door in front of her. *Id.*, 264:3-23; 542:4-10. Mr. Card turned and walked through the front door a moment later. Though Mr. McDonald stated that it takes seconds to walk between the front and side doors of Michelle's, Mr. McDonald did not hear the shot that struck Elsa Nelson until roughly a minute later. *Id.*, 264:10-23.

**<u>Elsa Nelson is Shot Outside of Michelle's Cocktail Lounge</u>**

The case ultimately centered around the interval between when Elsa Nelson and Mr. Card had left Michelle's Cocktail Lounge—Elsa Nelson through the side door and Mr. Card through the front door—and the shot that struck Elsa Nelson roughly one minute later. Two of the prosecution's witnesses, Julia Nelson and Eneida Stuart, testified to having seen Mr. Card

intentionally shoot Elsa Nelson. *Id*., 326:9-328:4; 543:24-544:4; 566:21-567:9. Both witnesses had credibility issues due to their relationships to Elsa Nelson—Julia Nelson was her sister, Eneida Stuart a friend[2]—and there were inconsistencies in both of their accounts. Exhibit S, Police Interview with J. Nelson, dated May 2, 1988; *see also* Exhibit Q, at 555:25-556:6-16.

The weakness of Julia Nelson's and Eneida Stuart's testimony was significant. None of the other witnesses claimed to have seen the shooting of Elsa Nelson. Further, the forensic evidence was inconclusive. Ballistics evidence was minimal. Many pieces of critical evidence—the gun used in the shooting, the bullet that struck Elsa Nelson, and the clothes Elsa Nelson was wearing—were not recovered from the scene. Exhibit R, Report of James L. Gannalo at 1. Further, the medical examiner called to testify by the prosecution was uncertain of the angle or distance from which the gun was fired. *Id.*, 396:16-19. Mr. Gregory's lack of independent preparation and reliance on the prosecution for information doomed the defense.

Julia Nelson testified that after she and Elsa Nelson exited out of the side door of Michelle's Cocktail Lounge, Julia ran to their car, which she testified was parked on Bedford Avenue in front of the entrance to Michelle's Cocktail Lounge. *Id.*, 385:10-19. Julia Nelson got into the back seat of the car on the side facing the front door of Michelle's Cocktail Lounge, leaving the car door open and holding her wounded right leg. *Id.*, 325:24-326:8. On direct examination Julia Nelson testified that she looked up just as Mr. Card shot Elsa Nelson with a single shot from roughly two feet away. *Id.*, 326:9-328:4.

Mr. Gregory did not cross examine Julia Nelson on the inconsistencies between her direct testimony and her audio-taped and transcribed police interview taken the day of the shooting,

---

[2] Exhibit Q, 298:4-5; 538:17-22.

where she told the police that Mr. Card had chased her and Elsa Nelson out the side door of Michelle's Cocktail Lounge.  Exhibit S.

Eneida Stuart's account was also inconsistent with the testimony of Julia Nelson.  First, Ms. Stuart was the only witness who testified to hearing two shots fired outside of Michelle's Cocktail Lounge.  Exhibit Q, 555:25-556:6-16.  Ms. Stuart testified that at the time the shot(s) were fired, she was hiding in a corner attempting to calm her sister.  She said that she only looked up from the corner where she was hiding in *after* the first shot was fired when someone yelled "it's Elsa."  *Id.*  Only *then* did Ms. Stuart testify that she saw Mr. Card fire a second shot at Elsa Nelson from close range.  Mr. Gregory did not cross examine Ms. Stuart as to how she could have seen the shooting given that her view was obstructed in the position she was in, especially as she was attending to her sister at the time.

Mr. Gregory's inability to effectively cross examine Ms. Stuart, was unsurprising.  Mr. Gregory had not expected that Ms. Stuart would testify at all.  Instead, Mr. Gregory assumed that any witness the prosecution intended to call would be mentioned in the discovery that he obtained from the prosecution.  *Id.*, 458:19-22.  However, Ms. Stuart was not on the prosecution's witness list as the prosecution was unable to secure Ms. Stuart's testimony until the day she testified. *Id.*, 459:1-9.  Mr. Gregory, who had relied almost exclusively on the *prosecution's* investigation, due to the inadequacy of his own, was wholly unprepared to effectively cross-examine Ms. Stuart.

**<u>The Defense's Case</u>**

The contrast between the defense's case and the prosecution's was stark.  The defense only called two witnesses, Amelia Francis (Mr. Card's mother) and police detective Wayne Bolt.  Neither witness was present during the shooting on May 2, 1988.  Further, Francis only testified

to explain the meaning of Mr. Card's Spanish nickname—the prosecution suggested it had violent connotations. Exhibit Q, 527:14-534:5.

**Summation – Mr. Gregory Attempts to Establish an EED Defense**

Having never given a thought to an EED defense (or a self-defense theory) until that point, Mr. Gregory sought a self-defense instruction, and an EED charge. The court denied the self-defense charge, but agreed to instruct the jury on the EED defense.

Mr. Gregory then proceeded to concede Mr. Card's guilt during summation in an unwieldy attempt to establish the EED defense. A trial that began with Mr. Gregory saying "I'm not ready" ended with Mr. Gregory conceding that his representation was deficient, telling the jury during his summation "I probably haven't done everything I could do in this case." *Id.*, 628:15-16.

**The Jury Charge, the Jury's Request for Clarification Regarding the Extreme Emotional Disturbance Defense, and Mr. Card's Conviction**

Based on the evidence, the Court gave jury charges for second degree murder and its affirmative defense of Extreme Emotional Disturbance ("EED"), first degree manslaughter, and second degree manslaughter. On July 27, 1995, for the events inside Michelle's Cocktail Lounge, the Court charged reckless endangerment, and also the alternative counts to Mr. Card's first degree charge of criminal possession of a weapon of second and third degree criminal possession of a weapon. *Id.*, 707:22-708:2.

The jury struggled with the question of whether Mr. Card had the requisite intent for second degree murder or was under the influence of EED at the time of the shooting of Elsa Nelson. This struggle is evident in the note that the jury sent the Court during their deliberations, which sought clarification of "the legal definition of intent" and an explanation of the "meaning of [EED]." *Id.*, 691:11-701:15.

16

However, the jury ultimately convicted Mr. Card of second degree murder, first degree reckless endangerment, and second degree criminal possession of a weapon on July 27, 1995. Exhibit Q, 707:22-708:2.

**State Appellate and Post-Conviction Proceedings**

On September 7, 1995, Mr. Card filed a notice of appeal with the was subsequently filed with this Court.  On June 25, 2002, the Appellate Division, Second Department granted Mr. Card's second pro se motion for leave to prosecute an appeal as a poor person and for the assignment of counsel to represent him in the during the appeal of the 1995 judgment.

**The 2004 Reconstruction Hearing**

On February 25, 2004, Mr. Card submitted a Notice of Motion for a Reconstruction Hearing with the Second Department after learning that the minutes from the September 5, 1995 sentencing proceedings could not be found and that a transcript could not be provided.  The Second Department granted Mr. Card's motion on April 1, 2004 and referred the matter to the New York Supreme Court ("NYSC") for a reconstruction hearing concerning the September 5, 1995 sentencing proceedings.  On March 21, 2007, a reconstruction hearing was held in New York Supreme Court, Kings County and the NYSC entered its findings of fact on April 20, 2009.  Ms. Bukumira testified at the reconstruction hearing but had little independent recollection of the 1995 sentencing.

**The 2009 440 Proceedings & Abeyance Motion**

On May 14, 2009, Mr. Card filed the 2009 Motion in the NYSC and moved to hold his direct appeal in abeyance pending the resolution of the 2009 440 proceedings.  The Second Department granted Mr. Card's motion to hold the direct appeal in abeyance by order dated June 29, 2009.

Mr. Card asserted, *inter alia*, that Mr. Gregory was ineffective in failing to adequately his case. Exhibit D at 15.  Mr. Card recounted how Mr. Gregory failed to hire an investigator until one week before trial, found no defense witnesses, and failed to hire experts necessary to properly defend the case. *Id.*

In support of the 2009 440, Mr. Card submitted sworn declarations from Mr. Cecilio Richards, who was present on the night of the shooting and Mr. Sherwin Johnson, the owner of Michelle's Cocktail Lounge.  Mr. Card also provided the sworn statement of Mr. Tor Ekeland, Mr. Card's counsel, regarding his conversations with Witness W, an eyewitness to the shooting who refused to sign an affirmation due to fear of retaliation from the Nelson family.  Mr. Richards and Mr. Johnson were contacted by Mr. Race during 2003.  Mr. Ekeland contacted Mr. Johnson in 2007 and Mr. Johnson arranged for him to speak with Witness W.  These information provided by these three individuals provided a strong indication that Mr. Gregory's failure to promptly seek out potential witnesses for the defense was a costly mistake.

Mr. Richard's testimony would have greatly assisted in establishing an EED defense.  Mr. Richards could have testified that: (i) Elsa Nelson ambushed Mr. Card as he exited Michelle's and Mr. Card only fired after she came at him; (ii) Mr. Card initially tried to walk away from the provocations of Elsa Nelson and her friends and family; and (iii) one of the bottles thrown by one of the Nelsons hit Card in the face and drew blood.  That blow to Card's

head inside of Michelle's caused him to linger inside the bar.  Although Richards was available and willing to testify on Card's behalf in 1995, no attorney contacted him prior to Card's trial.

Similarly, Witness W had never previously been interviewed by the defense, yet witness W saw what happened at the bar that night and like Mr. Richards would have helped corroborate Mr. Card's account.  W could have testified that:  (i) Elsa Nelson was surprised and upset to see Card with his new girlfriend at Michelle's; (ii) after leaving Michelle's and traveling to another bar, Elsa Nelson insisted upon returning to Michelle's in order to confront Card; (iii) despite Elsa Nelson's repeated attempts to argue with him, Card attempted to maintain his composure; and (iv) after hearing a gunshot outside Michelle's, W exited the bar and saw Elsa Nelson on the sidewalk of the Albemarle St. side of the bar between a dumpster and the front door.  (*Id*. at ¶ 5).

The Court held evidentiary hearings on September 20 and 27, 2010 and heard testimony from Mr. Card, Mr. Gregory, Ms. Herbert, Mr. James Gannalo (the ballistics expert at the 1995 trial), and Mr. Race. Exhibit D at 1.  Justice Tomei signed subpoena's for both Witness W and Mr. Richards.  However, neither appeared to testify. *Id.* at 17.

Justice Tomei rejected Mr. Card's claim that Mr. Gregory failed  to adequately investigate his case.  Justice Tomei found that Mr. Card had only furnished Mr. Gregory with the names of potential witnesses on July 17, 1995 and Mr. Gregory made a reasonable choice in refraining from hiring an investigator until provided specific names due to the time since the events.  *Id.* at 16.  Justice Tomei held that Mr. Gregory could not be held responsible for failing to locate witnesses Mr. Richards and Witness W as they failed to testify at the evidentiary hearing.  *Id.* at 17.

Jusitce Tomei also ruled that Mr. Gregory had not failed to adequately prepare an EED defense, concluding that Mr. Gregory had not considered investigating the defense until Ms. Stuart's testimony prompted a change in strategy.  Exhibit D at 18.

Accordingly, Justice Tomei denied the 2009 440.

**The United States Supreme Court's Decision in *Lafler v. Cooper***

Following the United States Supreme Court's March 21, 2012 decision in *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), clarifying the *Strickland*  analysis in the plea-bargaining context, Mr. Card's counsel contacted Kings County Assistant District Attorney Lori Glachman on April 27, 2012. Exhibit V, Affirmation of Michael Morrissey, dated February 15, 2013, ¶ 1. Mr. Card's counsel, Sidley Austin LLP attorneys, Jeffrey Green, Algeria Aljure, and Michael Morrissey, discussed the *Lafler* decision and Mr. Card's new grounds for appeal with Ms. Glachman on a conference call. In light of the remedy articulated in *Lafler,* Mr. Card's counsel informed Ms. Glachman that Mr. Card would accept Respondent's original 1995 plea offer of manslaughter in the first degree carrying a sentence of 8 1/3 years to 25 years and voluntarily dismiss his appeal.  Mr. Card's counsel also informed Ms. Glachman that counsel would contact Mr. Gregory to learn more about the plea negotiations preceding Mr. Card's trial.

Ms. Glachman stated that, although it was unlikely Respondent would re-offer the plea, she would notify Mr. Card's counsel of Respondent's position after discussing the request with her supervisor.  Later that day, Ms. Glachman notified Michael Morrissey that Respondent declined to re-offer the original plea to Mr. Card.  At no time did Ms. Glachman or any other member of her office dispute that Mr. Card was offered a plea of manslaughter in the first degree or state that the only plea the People ever offered to Mr. Card was murder in the second degree.

Counsel then contacted Mr. Gregory regarding the plea-bargaining process in Mr. Card's case.  Over the course of several exchanges in June 2012, Mr. Morrissey, Ms. Aljure and Mr. Gregory drafted and revised a declaration detailing Mr. Gregory's recollection of the plea negotiations.  On June 8, 2012, a draft declaration was sent to Mr. Gregory via email, which was subsequently revised to incorporate Mr. Gregory's comments.  On June 21, 2012, Mr. Morrissey reviewed each paragraph of the draft declaration with Mr. Gregory orally and annotated the draft to reflect Mr. Gregory's comments.  Once satisfied that the draft declaration accurately reflected his recollection of the plea negotiations, Mr. Gregory provided Mr. Card's counsel with a signed, notarized version of his declaration.

In discussing the draft declaration with Mr. Morrissey, Mr. Gregory discussed both the plea negotiations that took place in Mr. Card's case as well as his typical practices with respect to plea negotiations.  Mr. Gregory stated that if he thought one of his clients should accept a plea offer, he would be extremely assertive and go down to "the Pens"—the New York State holding pens where prisoners are held between court appearances—in order to try to convince them to accept.   Mr. Gregory said he did not do that with Mr. Card.  Further, Mr. Gregory specifically characterized Paragraph 10 of his declaration—which states: "I did not offer any opinion on whether Mr. Card should accept the plea"—as a fair comment.

**The Direct Appeal Resumes**

Shortly after counsel's discussions with Mr. Gregory, Respondent moved to dismiss Mr. Card's appeal—held in abeyance during the pendency of the 2009 440 proceedings—for failure to prosecute.  On September 17, 2012, the Second Department denied the motion with leave to renew if Mr. Card did not perfect his appeal by December 13, 2012.

Mr. Card perfected his appeal and asserted that: (1) his constitutional right to a speedy trial was violated, (2) that he received ineffective assistance of counsel during the 1995 proceedings as a result of Mr. Gregory's failure to adequately represent him during pre-trial plea negotiations, and (3) that the trial court had abused its discretion in refusing to grant a continuance in order to allow Mr. Gregory to adequately prepare for trial.  Exhibit A.

In affirming the 1995 judgment, the Second Department rejected Mr. Card's speedy trial claim, and challenge to the trial court's refusal to grant a continuance as unpreserved for appellate review[3] and dismissed the claim of ineffective assistance of counsel as based on matters *dehors* the record. Exhibit A.

### The 2012 440 Proceedings

On November 14, 2012, Mr. Card filed the 2012 Motion in the New York Supreme Court, Kings County (Simpson, J.), seeking to vacate the judgment of conviction him on the grounds that Mr. Gregory failed to provide effective assistance of counsel during the 1995 plea negotiations by first, failing to provide his opinion as to whether Mr. Card should accept the plea agreement offered, and second, by failing to assist Mr. Card in making an informed decision as to whether to accept.[4]

In support of the 2012 440, Mr. Card submitted a sworn statement in support of the 440 Motion stating that he had received a plea offer of first-degree manslaughter, and recalling that Mr. Gregory had not offered a recommendation as to whether Mr. Card should accept it.  Mr. Card also submitted Mr. Gregory's signed declaration corroborating Mr. Card's account, stating

---

[3] The Second Department also held that Mr. Card's challenge to Justice Firetog's refusal to grant a continuance was without merit. *See* Exhibit A.

that Mr. Card had been offered a plea of first degree manslaughter and stating that Mr. Gregory had not expressed his opinion as to whether Mr. Card should accept it.

In support of Respondent's January 25, 2012 opposition to the 2012 Motion, Mr. Gregory submitted a declaration that conflicted with his own prior sworn statement.  In his second declaration, Mr. Gregory denied having any recollection of the manslaughter plea after reviewing documents provided to him by Respondent.  Mr. Gregory asserted that he believed Mr. Morrissey was citing facts from the Supreme Court file, when discussing the plea negotiations in June of 2012—and that Mr. Gregory has now had the opportunity to review the People's file. Respondent also submitted declarations from Ms. Bukumira-Bloom and her supervisor at the time, the Deputy Bureau Chief Paul Burns.  In their statements, Ms. Bukumira-Bloom and Mr. Burns relied on notes found in the 1995 trial file and their recollection of the plea-bargaining practices at the time of the 1995 negotiations.  Both Ms. Bukumira-Bloom and Mr. Burns stated that Mr. Card received a plea offer of second degree murder, carrying a prison term of fifteen years to life—a term ten years shorter than the sentence ultimately imposed following the 1995 trial.

Ms. Bukumira-Bloom expressed "certainty" regarding her account of the plea-bargaining process—a claim that is difficult to reconcile with her inability to recall much of the sentencing proceedings.  Further, Mr. Gregory stated he is "sure" he discussed plea-bargaining with Mr. Card, and Mr. Burns is certain of the plea offer Mr. Card received, notwithstanding that both Mr. Gregory and Mr. Burns disclaim any independent recollection of the events.

On October 23, 2014, Justice Simpson denied the 2012 440 without a hearing pursuant to CPL § 440.30.  Justice Simpson stated that as the "underlying factual assertions as to the plea

offer are completely unsubstantiated" no hearing regarding counsel's performance was necessary. Exhibit G at 11.

## ARGUMENT

### I.     THE PETITION IS TIMELY

Pursuant to Section 2244(d)(1)(A) of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") a 1-year limitations period applies to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court beginning on "the date upon which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Further, pursuant to Section 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with the respect to the pertinent judgment or claim is pending shall not be counted toward" the 1-year limitations period provided by Section 2244(d)(1). 28 U.S.C. § 2244(d)(2). Under the law of this Circuit, an application is "pending" for purposes of Section 2244(d)(2) "from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures."  *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir. 2009) (per curiam) (quoting *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999)), *aff'd*, 531 U.S. 4 (2000)).  An application for State collateral review is also considered pending during the time between a lower court's decision and the filing of an application for leave to appeal to a higher state court. *See Carey v. Saffold*, 536 U.S. 214, 217 (2002).

Mr. Card's judgment became final for purposes of Section 2244(d)(1)(A) on December 17, 2013—90 days after the New York Court of Appeals' denial of his application for leave to appeal the order of the Appellate Division affirming his judgment of conviction on September 18, 2013.  *See* Exhibit A.  At that time, Card's second motion to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10 remained pending.  The 2012 Motion was denied

by the New York Supreme Court on October 23, 2014, *see* Exhibit G, and leave to appeal the

denial of the Second 440.10 Motion was denied by the Appellate Division on January 14, 2016.

*See* Exhibit H.  Accordingly, pursuant to Section 2244(d)(2), the 1-year limitations did not begin

to run until leave to appeal the 2012 Motion was denied.  *See Lovasz v. Vaughn*, 134 F.3d 146,

149 (3d Cir. 1998).  Accordingly, the deadline would normally expire on the anniversary date of

that order, Saturday, January 14, 2017. *See Mickens v. United States*, 148 F.3d 145, 148 (2d Cir.

1998) (noting that the Second Circuit follows the anniversary rule with respect to limitations

periods measured in years). However, pursuant to Fed. R. Civ. P. 6(a), the deadline to file is

extended until the next business day—Tuesday, January 17, 2016.  *Id.* (applying Rule 6(a) to

time calculations under AEDPA).

Accordingly, this application for relief pursuant to 28 U.S.C. § 2254 filed on January 13,

2017 is timely.

**1.   NO STATE LAW PROCEDURAL DEFAULT BARS FEDERAL REVIEW OF THE PETITION**

Initially, no independent and adequate state law ground prevents the Court from

considering Mr. Card's claims of ineffective assistance of counsel.  Justice Tomei did not

decline to review any of the claims in the 2009 440 proceedings pursuant to state law.  Further,

while Justice Simpson denied Mr. Card's request for an evidentiary hearing during the 2012 440

proceedings "both procedurally and on the merits," Order at 9, Justice Simpson's

characterization of the CPL § 440.30(4) inquiry as "procedural" is clearly wrong.  A State court

decision pursuant to CPL § 440.30(4) does not rest on a state law basis independent of the

federal issue. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (holding federal courts must

independently determine whether a state law ground for the judgment "is independent of the

federal question").

The rationale for Justice Simpson's "procedural" denial of an evidentiary hearing was that Mr. Card's *Lafler* claim "rest[ed] on the false foundational assertion that the People authorized and offered a plea to manslaughter in the first degree,"  Order at 9-10, meaning "there [was] no issue of *fact* requiring resolution in a hearing."  Order at 7 (emphasis added). Notwithstanding Justice Simpson's characterization, it is obvious that Justice Simpson decided Mr. Card's *Lafler* claim "on the merits."  Justice Simpson's reference to the absence of *factual* disputes concerns "the substance of the claim."  *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).

Multiple federal decisions recognize that "*any* decision issued pursuant to Section 440.30(4) should be considered a 'judgment on the merits.'"  *Giraldo v. Bradt*, No. 11-cv-2001 (JFB), 2012 WL 3835112, at *8 (E.D.N.Y. Sep. 5, 2012) (collecting cases).  By it's own terms, CPL § 440.30(4) allows the State court to deny relief "'[u]pon considering the merits of the motion'" and "[t]he plain meaning of th[at] phrase … suggests that a court must consider the merits of the motion before dismissing it."  *Id.* (quoting CPL § 440.30(4)) (alterations in the original).  An order issued under CPL § 440.30(4) "is a merits-based decision not a procedural bar."  *Gonzalez-Pena v. Herbert*, 369 F. Supp. 2d 376, 389 (W.D.N.Y. 2005).  Justice Simpson determined—unreasonably—that the *merits* of Mr. Card's "*Lafler/Frye* claim [did] not warrant further consideration."  Order at 11.

Mr. Card's *Lafler* "claim has already been given full consideration by the state courts and [] is *ripe* for federal adjudication."  *Cone*, 556 U.S. at 467.

## II.   THE STANDARD OF REVIEW UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") federal courts may not issue a writ of habeas corpus:

> with respect to any claim … adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See, e.g.*, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When … § 2254(d)(1) is satisfied … [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  In addition, where a federal court properly addresses a claim (or element) not addressed on the merits in state proceedings, the claim is reviewed de novo.  *See Cone*, 556 U.S. at 472 (holding Section 2254(d) inapplicable where "the Tennessee courts did not reach the merits of [the] *Brady* claim"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing prejudice prong under *Strickland v. Washington*[5] de novo where state courts did not resolve the issue on the merits).

## III.    MR. GREGORY RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT

Mr. Gregory's general inattentiveness to Mr. Card's case "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and prejudiced Card by depriving him of the well-informed advice with respect to his case he needed throughout the 1995 trial proceedings.

In order to establish ineffective assistance of counsel under *Strickland*, the defendant must demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and (2) "a *reasonable probability* that, but for

---

[5] 466 U.S. 668 (1984).

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). Both reasonableness and resulting prejudice, are "consider[ed] … in the aggregate." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001). "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact" *Strickland*, 466 U.S. at 698.

Counsel's duty to thoroughly "investigat[e] [the] law and facts relevant to the[ir] [client's] plausible options," *id.* at 690-91, lies at the center of the *Strickland* performance requirement. *Strickland* mandates substantial deference for counsel's "strategic choice[s]." A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001) (determination investigation was unnecessary due to weakness of prosecution's case motivated by counsel's desire to avoid additional work was not "strategic" within the meaning of *Strickland*). *Strickland's* deferential inquiry does not permit "*post hoc* rationalization" of the decision. *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).

Furthermore, counsel's performance will not support a claim for ineffective assistance of counsel absent "a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The "reasonable probability" necessary to satisfy *Strickland's* prejudice prong "is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 694. *Strickland* does *not* require proof of a more favorable result "by a preponderance of the evidence." *Id.* Counsel's unprofessional errors may be prejudicial even if the chance of a better outcome "would still have been significantly less than 50 percent." *Miller v. Anderson*, 255 F.3d

455, 459 (7th Cir. 2001), *appeal dismissed after settlement*, 268 F.3d 485 (7th Cir. 2001) (Mem.).

A.   **Judge Tomei's Decision Does Not Bar Issuance of the Writ as it Rests Upon an Unreasonable Determination of Fact and Unreasonably Applies Well-Established Federal Law**

Justice Tomei's conclusion that Mr. Gregory's made a reasonable decision not to investigate a potential EED defense or attempt to locate witnesses in Mr. Card's case until was both an unreasonable factual determination and a misapplication of the *Strickland* analysis. Mr. Gregory did not "decide" not to pursue witnesses or evaluate alternative defenses; he failed to.

Accordingly, either subsection of 28 U.S.C. 2254(d) permits the Court to grant the Writ.

1.   **Trial Counsel's Failure to Investigate Lack of Diligence Warrants No Deference**

First, Mr. Gregory did not make an affirmative decision not to investigate witnesses, he simply failed to conduct any investigation. Mr. Gregory's "behavior was not colorably based on tactical decisions but merely upon a lack of diligence." *United States v. Gray*, 878 F,2d 702, 712 (3d Cir. 1989). In seeking a continuance, Mr. Gregory conceded that he needed more time to prepare because "[he] ha[dn't] spent enough time with the case with Mr. Card." Exhibit N, 5:2-7. In fact, Mr. Gregory's repeated requests for a continuance clearly indicate that *given the choice*, Mr. Gregory would have chosen to perform a more extensive investigation of Mr. Card's claim. However, after Mr. Card's case had been pending for six months, the decision was no longer his to make.

Second, the hearing testimony clearly indicates that any "decision" Mr. Gregory made relating to whether or not to investigate Mr. Card's claim was not made with the intention of benefitting Mr. Card. *Pavel v. Hollins*, 261 F.3d at 218 (holding that a decision is not "strategic" within the meaning of *Strickland* if not made for client's benefit). Mr. Card stated that he

attempted to focus Mr. Gregory's attention on his case but that Mr. Gregory had been preoccupied with other matters.   Exhibit C, 73:34; 77:4-5.   Mr. Gregory's own statements strongly corroborated Mr. Card's statement.   In his first request for a continuance, Mr. Gregory explained that he needed more time to investigate Mr. Card's case because he had "been tied up." Exhibit M, 2:20-26.   Accordingly, even if Mr. Gregory had only received a list of witnesses from Mr. Card a few days prior to jury selection,   Mr. Gregory's contemporaneous statements make clear that it was *his* competing obligations that prevented him from adequately conducting a pretrial investigation.

Third, even assuming Mr. Gregory's neglect could be construed as a conscious decision made to further Mr. Card's defense, any delay attributable to Mr. Card's not having "push[ed] that hard to locate" witnesses, obviously resulted from Mr. Gregory's deficient advice.   Mr. Gregory attributed Mr. Card's purported delay in bringing potential witnesses to his attention to the "expect[ation] there would be some preliminary matters would be held (sic) some weeks before trial."   N Exhibit, 5:2-8.   If Mr. Card did have that expectation, it stemmed from Mr. Gregory's   *false* assurances that he would be able to obtain a continuance if necessary.   Mr. Gregory's mistaken belief that a continuance would be granted was not a "reasonably informed" decision warranting deference. *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (holding that counsel's failure to obtain records caused by misunderstanding of state law was not a "strategic calculation" meriting deference); *Kimmelman v. Taylor*, 477 U.S. 365, 385 ("Counsel's failure to request discovery … was not based on 'strategy' but on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense.").

Respondent cannot dispute that Mr. Gregory's assurances with respect to his ability to obtain a continuance were unfounded.   During Mr. Card's direct appeal Respondent asserted that

the trial court acted within its discretion in denying Mr. Gregory's request for a continuance, and the Second Department adopted Respondent's position. *See* Exhibit A.  Accordingly, Respondent is estopped from suggesting that Mr. Gregory's assurances to Mr. Card had any legal basis.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895))).

Finally, Mr. Gregory's assertion that he would not have let himself be forced into trying a case without adequate preparation, and that if he had not felt prepared there "would have been a big problem,"  Exhibit C, 165:8-12, is meritless.  Mr. Gregory alerted the trial court to his unpreparedness on two occasions, and in each instance the court refused his request.  His suggestion that, had he *really* needed more time, he could have obtained it is unsubstantiated by the record.

Mr. Gregory's own statements as well as the overwhelming weight of the evidence indicate that his failure to adequately prepare for Mr. Card's trial rested on his mistaken beliefs, and lack of diligence.  *See Kimmelman*, 477 U.S. at 385; *Gray*, 878 F.2d at 712.

**2.    Mr. Gregory's decision to focus exclusively on a misidentification theory until summation was objectively unreasonable.**

Mr. Gregory, fully aware that the shooting took place in a crowded bar following a dispute, and that Mr. Card and Ms. Nelson had a physically violent relationship personal history, relied solely on a misidentification theory until his summation due to his failure to adequately investigate alternative  strategies. Mr. Gregory's "failure to consider [] alternative defense[s] cannot be considered 'strategic' where counsel has 'failed to conduct even the minimal

investigation that would have enabled him to come to an informed decision about what defense to offer.'" *Phillips v. Woodford*, 267 F.3d 966, 978 (9th Cir. 2001).

Under New York law, EED has subjective and objective prongs that a defendant must establish by a preponderance of the evidence. *People v. Harris*, 95 N.Y.2d 316, 319, 717 N.Y.S.2d 82, 84 (2000). The subjective prong requires evidence showing "that the defendant's conduct was actually influenced by an extreme emotional disturbance." *Id*. This prong "is generally associated with a loss of self-control." *Id*. The objective prong is met when there is evidence "of a reasonable explanation or excuse for the emotional disturbance." *Id*. Whether there is a reasonable explanation or excuse is determined "by viewing the subjective, internal situation in which the defendant found himself and the external circumstances as he perceived them at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for his emotional disturbance was reasonable." *People v. Casassa*, 49 N.Y.2d 668, 679, 427 N.Y.S.2d 769, 775 (1980).

The application of EED is available in a broad range of situations where "the trier of fact believes that leniency should be given to an emotionally disturbed defendant." *Harris*, 95 N.Y.2d at 319, 717 N.Y.S.2d at 84. Moreover, the response influenced by an extreme emotional disturbance need not be immediate. *Casassa*, 49 N.Y.2d at 676, 427 N.Y.S.2d at 773. Instead, "it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore." *Patterson*, 39 N.Y.2d at 303, 383 N.Y.S.2d at 582 (1976).

Here, Mr. Gregory discounted the possibility of pursuing any sort of mitigation defense out of hand. Exhibit C, 162:15-17.. He claims that he did so pursuant to Mr. Card's wishes but he has no independent recollection of this. Further, as discussed Mr. Gregory did not speak with

Mr. Card after receiving discovery from the prosecution—the basis for his investigation. Further, Mr. Gregory had previously been successful in establishing EED defenses in cases like Mr. Card's. Exhibit C, 208:22-25.   Mr. Gregory's failure to even consider or discuss the possibility of EED defense with Mr. Card after having *finally* obtained information regarding the specifics of the case was constitutionally deficient performance.   Mr. Gregory knew that "the facts didn't really carve out quite our [misidentification] defense, because Elsa Nelson was shot in front of a crowded bar and it was a difficult case."   (Sept. 20, 2010 Tr. 187:12-13.)   Mr. Gregory also knew that Ms. Nelson had behaved violently towards Mr. Card in the past, including on May 2, 1988.   Exhibit I, ¶¶ 10-11.   Under these circumstances, Mr. Gregory's "abandonment of the EED defense was so hasty and based on so little … [it] cannot be considered either a reasonable professional judgment or a reasoned strategic choice."   *DeLuca v. Lord*, 77 F.3d 578, 588 (2d Cir. 1996).

### 3.    Trial Counsel's failure to investigate witnesses and consider alternative defenses prejudiced Mr. Card.

As, the statements submitted in support of the 2009 440 indicate, Mr. Gregory's failure to adequately investigate his case prejudiced Mr. Card. Mr. Gregory likely could have located more potential witnesses had he adequately canvassed Michelle's in 1995. Almost nineteen years after the shooting, at least one witness to Elsa Nelson's—Witness W—still patronized Michelle's. There is a definitely a "reasonable probability" that, if had Mr. Gregory had affirmatively considered an EED defense after a reasonable investigation, rather than trying to cross-examine a bar full of witnesses, the outcome of Mr. Card's trial would have been different.

**B.**     **Mr. Card was Deprived of his Sixth Amendment Right to Effective Assistance of Counsel as a Result of Mr. Gregory's Failure to Adequately Advise Him During Pre-Trial Plea Negotiations.**

"Advising a client on whether to plead guilty is [] a basic, and indispensable, function of a defense attorney in a criminal case." *United States v. Mejia*, 655 F.3d 126, 134 (2d Cir. 2011). Indeed, the Second Circuit has stressed that "it would be impossible to imagine a clearer case of a lawyer depriving a client of constitutionally required advice," than a situation where counsel fails to strongly encourage acceptance of a favorable plea. *Boria v. Keane*, 99 F.3d 492, 497 (2d Cir. 1996).   Here Mr. Gregory's cursory advice to Mr. Card during the plea negotiations, given without the benefit of a reasonable investigation into the strengths or weaknesses of the prosecution's case, was both deficient and prejudicial to his client who decided to stand trial and received a more severe sentence than he would have obtained through plea negotiations.

Where deficient performance is established, "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.* at 1387.

**1.**     **Mr. Gregory Failed to Provide Reasonably Informed Advice with Respect to the Plea Negotiations**

Mr. Gregory's failure to advise Mr. Card as to the advantages of a plea of first degree manslaughter was obviously deficient. Adequate advice within the plea-bargaining context "should usually include … providing information about the 'strengths and weaknesses of the case against the defendant, as well as the alternative sentences to which he will most likely be exposed.'" *See Fulton v. Graham*, 802 F.3d 257, 266 (2d Cir. 2015) (quoting *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999)) (holding that allegations that "counsel offered 'no guidance' during plea negotiations and 'failed to discuss the pros and cons of accepting the plea offer,' including the 'weakness in the defense' and that 'the evidence of guilt was

34

overwhelming'" would establish objectively unreasonable conduct by counsel if established in an evidentiary hearing).

In this case, the only "advice" Mr. Card recalls having received regarding the plea negotiations consisted of a "guesstimate" regarding how much time Mr. Card would have to serve pursuant to a plea. Exhibit C, 74:19-22. Mr. Gregory prefaced his "guesstimate" as to Mr. Card's parole eligibility under the plea by saying "I really don't know." There is no reason to question this description of the discussions between Mr. Card and Mr. Gregory with respect to the plea offer. Mr. Card's testimony was given during the evidentiary hearing held in connection with the 2009 Motion, where Mr. Gregory's performance during the plea negotiations was not at issue.

Moreover, Mr. Gregory's testimony and sworn statements corroborate Mr. Card's account. Mr. Gregory's first declaration submitted in support of the 2012 Motion acknowledged that he "did not offer any opinion on whether Mr. Card should [have] accept[ed] the plea offer." (Gregory Decl. ¶ 10.) It is also consistent with what Mr. Gregory described to Mr. Card's counsel during conversations relating to the drafting of Mr. Gregory's declaration in support of the 2012 Motion. Mr. Gregory believed that he had not provided Mr. Card with an opinion regarding whether to accept the plea because he did not recall having gone to Mr. Card's holding cell intending to urge Mr. Card to accept the plea. (Gregory Decl. ¶¶ 9-10.)

Moreover, the chronology of the pre-trial proceedings renders it highly implausible that Mr. Gregory could have provided Mr. Card with competent advice during the plea negotiations. It is undisputed that the plea-negotiations came to a close in the run up to trial, and that Mr. Gregory did not receive discovery from the prosecution until jury selection on July 18, 1995. It was also undisputed that Mr. Gregory's trial preparation focused almost exclusively on

reviewing materials provided to him by the prosecution.  Mr. Gregory notified the court of the fact that he had spent insufficient time with Mr. Card's case on July 17, 1995.  However, he claimed that by the time trial began on July 24, he had been able to adequately prepare.  As he explained, the period between July 17 and July 24, 1995 "that was a time to work on this case." (Sept. 20, 2010 Tr. 192:20.)  As the plea-negotiations occurred at a time when Mr. Gregory had concededly spent insufficient time investigating Mr. Card's case, Mr. Gregory could not have provided "'the effective assistance of competent counsel,'" *Lafler*, 132 S. Ct. at 1385 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)), Mr. Card was owed during plea negotiations as he had not yet investigated the strengths and weaknesses of the prosecution's case.  Particularly, where counsel recognizes the risk of proceeding to trial, without adequately investigating the case is unreasonable. *See Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir. 1998) (holding counsel's failure to investigate was unreasonable as "his bargaining position could have been enhanced by investigation"), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

Any attempt to rationalize Mr. Gregory's cursory discussions with respect to the plea negotiations by pointing to the parties "emphatic" positions and the danger of reluctance to "coerce" Mr. Card into accepting the plea have no support in the record.    During the evidentiary hearing relating to the 2009 Motion—where Mr. Card did not assert claims relating to the plea-bargaining process—Mr. Card described the plea negotiations as having fallen to the wayside as the parties focused their attention on the trial.  Exhibit C, 75:10:14.  The record contains no evidence that Mr. Gregory *decided* to forego further negotiations due to concerns over the potential coercive effect of his conduct.

On the contrary, as discussed, Mr. Gregory considered it completely appropriate to visit clients for the sole purpose of making an agressive case for acceptance of a plea offer. Exhibit U, ¶ 8.  Had Mr. Gregory actually decided that further discussion risked coercing a plea from Mr. Card, that conclusion—to the extent based upon a reasonable investigation—would, of course, enjoy substantial deference.  *Fulton*, 802 F.3d at 266 ("Because counsel must avoid both failing to give advice and coercing a plea, 'counsel's conclusion as to how best to advise a client … enjoys a wide range of reasonableness.'").  However, the record indicates that concerns regarding coercion are *post hoc* explanations for Mr. Gregory's inattention to his client that do not enjoy a presumption of reasonableness.  *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).

Mr. Gregory decided not to further investigate the possibility of a plea notwithstanding his subjective belief that it Mr. Card's case was difficult.  (Sept. 20, 2010 Tr. 159:12-13.)

## 2. Mr. Gregory's deficient advice resulted in the imposition of a far longer sentence after trial.

Where deficient advice results in the rejection of a favorable plea offer,  "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence."  Under the narrower federal standard, a defendant suffers prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Stated differently, "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice."  *Id.* at 1384.  Where a defendant relies on incorrect advice of counsel, he suffers prejudice.  *Gordon*, 156 F.3d at 380.  Courts often look for evidence beyond a defendant's own backwards-looking statement that he would have accepted a more favorable plea, and the courts have stated that a "significant . . . disparity"

between a defendant's sentence and the one he would have taken with proper advice "is sufficient to support a prejudice finding." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *see also Raysor*, 647 F.3d at 496; *Mask v. McGinnis*, 233 F.3d 132, 142 (2d Cir. 2000); *Gordon*, 156 F.3d at 381.

Here, Mr. Card has demonstrated that Mr. Gregory failed to properly advise him regarding his sentencing exposure.  (Gregory Decl. ¶¶ 9-10.)  Despite Mr. Card's statements to his attorney that he wanted to plead guilty if a concurrent sentence was available, Mr. Gregory did not explain to Mr. Card that, if Mr. Card accepted the plea offer, he would be eligible for conditional release after serving 16 years, even if his parole hearing was unsuccessful.  (Gregory Decl. ¶ 9.)  Mr. Card, currently serving a minimum of 26 2/3 years imprisonment, was thus sentenced to a prison term at least three times longer because of his Mr. Gregory's failure to advise.  Accordingly, under *Lafler*, Mr. Card suffered prejudice because he was given "a more severe sentence" than the one he would have received had he been properly advised.  *Lafler*, 132 S. Ct. at 1387.

Further, even Respondent's account of the negotiations in its state court filings establishes prejudice.   Respondent acknowledged that Mr. Gregory had not received any of the discovery he requested prior to advising Mr. Card—meaning he was not reasonably well informed as to the strength of the prosecution's case—and that Mr. Gregory's discussions with Mr. Card regarding the plea negotiations were quite brief.  Given that Mr. Gregory considered the case a difficult one, such cursory advice during the plea negotiations was clearly deficient. *See Fulton*, 802 F.3d at 266.

If Mr. Card had been properly apprised of his sentencing options, and if Mr. Gregory had explained the differences in sentences which would have resulted from accepting a plea versus

standing trial, Mr. Card would have accepted the plea offer of first-degree manslaughter.  (Card Aff. at ¶¶ 7, 12.)   During plea negotiations, Mr. Card informed Mr. Gregory that he was interested in pleading guilty to manslaughter.  (Gregory Decl. at ¶ 4.)  In a pretrial hearing, former ADA Bukumira informed the Court that "[t]here's a possibility of a disposition."  (June 14, 1995 Tr. 3:4.)  In addition, in his Decision and Order denying Mr. Card's 440 Motion, Justice Tomei found that Mr. Card "was willing to plead guilty . . . because he shot the victim and did not want to put her family through a trial."  (*See* Decision and Order, Nov. 3, 2010, at 4 n.3.) Thus, Mr. Card's resulting trial conviction for second-degree murder was "on more serious charges" than the manslaughter conviction he would have received under the plea agreement. *See Lafler*, 132 S. Ct. at 1387.

Mr. Gregory's failure to explain these two crucial aspects of the plea offer resulted in Mr. Card's rejection of the favorable plea.  That rejection in turn led to an increase in Mr. Card's sentencing exposure from a minimum of 8 1/3 years under the plea, to 26 2/3 years to life after trial – more than a threefold increase.  Under *Lafler*, that disparity, plus the showing that Mr. Card would have accepted the plea offered to him, constitute prejudice.  There is no question that there is a reasonable probability that but for Mr. Gregory's deficient advice, the out come of the plea negotiations may have been different.

C.     **Justice Simpson's Decision Does Not Prevent this Court from Issuing the Writ with Respect to Card's *Lafler* Claim as it Entailed an Unreasonable Determination of Fact**

This Court has the power to issue a writ of habeas corpus on Mr. Card's Sixth Amendment *Lafler* claim because Justice Simpson's denial of the 2012 Motion and her conclusion that Mr. Card had failed to substantiate his claim entailed an "unreasonable determination of the facts."  28 U.S.C. § 2254(d)(2).

Mr. Card's account of Mr. Gregory's deficient performance during the plea negotiations—corroborated by Mr. Gregory's own sworn statement—rendered Justice Simpson's denial of the 2012 Motion without a hearing unreasonable in light of the record before her.

The Supreme Court's decision in *Brumfield v. Cain*, demonstrates that, in light of the record before her, and within "the [state law] framework in which these factual determinations were made," 135 S. Ct. at 2277 n.3, Justice Simpson's denial of Mr. Card's *Lafler* claim without a hearing rested upon unreasonable factual determinations.

 In *Brumfield*, the U.S. Supreme Court held that, faced with "countervailing evidence," a state court's determination that no evidentiary hearing was necessary was "an unreasonable determination of the facts" given "how low the threshold for an evidentiary hearing [under Louisiana law] was intended to be." 135 S. Ct. at 2281-82. The Court noted that while "evidence in the record … may have cut against Brumfield's claim … in seeking an evidentiary hearing, Brumfield was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much" in order to obtain a hearing. *Id.* at 2280. The defendant was only required "to raise a 'reasonable doubt' as to his intellectual disability." *Id.* Accordingly, the state court erred in denying relief on the papers alone.

Similarly, under New York law, the court's views as to "the defendant's chances of ultimate success in meeting his burden of proof" in an evidentiary hearing "does not, by itself, furnish a basis to deny" one. *People v. Hughes*, 181 A.D.2d  912, 913 (N.Y. App. Div. 1992) (requiring a hearing "where defendant's motion was not based on his own averments alone, but was also supported by other evidence … the People contend[ed] was false, without conclusively proving a fabrication"). Section 440.30(4) only permits the state court to forego a hearing

where the moving papers:  (a) do not *allege* any basis for relief; (b) do not contain sworn affidavits substantiating the facts alleged; (c) are refuted by *unquestionable documentary* proof; or (d) rest on an allegation supported *only by defendant's declaration* or contradicted by a court record or other official document where "there is *no reasonable possibility* that such allegation is true." CPL § 440.30(4) (emphasis added).

The reasonableness of the Justice Simpson's fact-finding in denying an evidentiary hearing must be understood within the context of CPL § 440.30, "because it provides the framework in which these factual determinations were made." *Brumfield*, 135 S. Ct. at 2277 n.3.  Justice Simpson did not dispute either the sufficiency of the *allegations* or the fact that Mr. Card had submitted sworn statements in support of his CPL § 440.10 motion.  Rather, she denied an evidentiary hearing in reliance upon "the People's records and sworn statements."  It follows that Justice Simpson denied an evidentiary pursuant to either Subsection 440.40(4)(c), or  440.30(4)(d).  On the record before her, Justice Simpson could not reasonably have determined that dismissal was warranted pursuant to either provision.

### D. The CPL § 440.30(4)(c) requirements were not satisfied

Section 440.30(4)(c) permits the state court to forego a hearing only where defendant's allegations are "conclusively refuted by *unquestionable documentary* proof."  Respondent submitted sworn affirmations contesting Card's statement and limited handwritten notes from Mr. Card's trial file.  None of the evidence submitted by Respondent's qualifies as unquestionable documentary evidence within the meaning of Subsection 440.30(4)(c).  The New York Court of Appeals has *expressly stated* that affirmations disputing the evidence offered by a defendant "are not documentary evidence, … do not conclusively refute the defendant's allegations" and thus do not provide a basis for denying an evidentiary hearing. *People v. Session*, 34 N.Y.2d 254, 256 (1974).  Nor do informal handwritten notes taken from

the files of a party to the proceeding constitute "unquestionable documentary proof" within the meaning of Subsection 440.30(4)(c).  *See People v. Chu-Joi*, 26 N.Y.3d 1105, 1107 (2015) (holding evidentiary hearing unnecessary where allegations were refuted by birth certificate, a registration form, and passport obtained from the Peruvian government—a non-party to the proceedings).

### E.     Nor were the CPL § 440.30(4)(d) elements satisfied.

Dismissal pursuant to CPL § 440.40(4)(d) would also have been unreasonable.  Under Section 440.30(4)(d), two requirements must be met before the state court may forego a hearing. First, the court must make a threshold determination that an essential allegation is either "contradicted by a court record or other official document, or [] made solely by the defendant … unsupported by any other affidavit or evidence."  CPL § 440.30(4)(d)(i).  However, even Justice Simpson acknowledged that Mr. Card did not solely rely upon his own unsupported affidavit, Order at 5, and that the Court record both indicates a plea offer was discussed and that it "does not clearly specify the underlying charge."   Exhibit G at 11.   Justice Simpson's own characterization of the record establishes that Subsection 440.30(4)(d)(i) was not satisfied.

Finally, even if the Section 440.30(4)(d)(i) threshold was met, denial would still have been unreasonable.  In their respective statements submitted in support of Respondent, both Mr. Gregory and Mr. Burns stated that they *did not* have an independent recollection of the plea negotiations. Rather, both relied upon information regarding their general practices.  *See Millington v. Lee*, 2015 WL 1402133, *27 (S.D.N.Y. Aug. 14, 2014) ("Based on this record, it [] would have been unreasonable for the state court to conclude, without a hearing that [counsel's] statements as to his general practice—and his statements about his recollection— conclusively disproved Mr. Card's and his brother's specific recollections."); *Montes De Oca v. Walsh*, 2007 WL 4591991, at *15 (S.D.N.Y. Dec. 2007) (holding state court was unreasonable

for denying hearing in reliance upon an "affirmation … [given] the existence of affirmations to the contrary").

Accordingly, given that even Justice Simpson's characterization of the record before her does not support her dismissal of the 2012 Motion without a hearing pursuant to Section 440.30(4), this Court may grant the Writ as 28 U.S.C. § 2254(d)(2) is satisfied.

## RELIEF REQUESTED

As Mr. Card has established his entitlement to relief and the decisions of the state courts do not preclude the issuance of the Writ.

The Supreme Court and the Second Circuit have held that an appropriate remedy for counsel's having been ineffective restores the defendant to the position that he would have been in but for counsel's deficient representation *See United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000) ("Th[e appropriate] remedy is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error"); *Gordon*, 156 F.3d at 381 ("[W]here there has been a finding of ineffective assistance of counsel . . . , the remedy 'should be tailored to the injury suffered from the constitutional violation . . .'") (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)).

Given the reasonable probability that—but for Mr. Gregory's deficient conduct—Mr. Card would have been convicted of first-degree manslaughter, it should order Mr. Card's release unless Mr. Card's sentence is reduced accordingly.  Alternatively, to the extent the Court feels Mr. Card's claim require additional factual development, it should hold an evidentiary hearing to determine Mr. Card's entitlement to relief.

Dated: January 13, 2017

SIDLEY AUSTIN LLP

By:_____

Taylor Napolitano
787 7 th Ave.
New York, NY  100019
Telephone:  +1 212 839 6734
Facsimile:  +1 202 736-8711

Daniel R. Perez
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  +1 202 736-8000
Facsimile:  +1 202 736-8711

daniel.perez@sidley.com

Attorneys for Javier Card

## PETITIONER VERIFICATION

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed

12 day of Jan , 2017.

By:  _____
        Javier Card
        Petitioner